UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:14-cr-00103-JAW |
| | ) | |
| JOHN C. SLATER | ) | |

**ORDER ON MOTION FOR COMPASSIONATE RELEASE**

A seventy-three-year-old inmate serving a one-hundred-fifteen-month sentence for bank robbery in violation of 18 U.S.C. § 2113(a) moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A) in light of the risk the COVID-19 pandemic poses to his health and his back conditions. The Court concludes the inmate has not shown extraordinary and compelling reasons warrant his release from incarceration and that the 18 U.S.C. § 3553(a) factors weigh against release. The Court dismisses the inmate's motion for compassionate release without prejudice.

## I.    PROCEDURAL BACKGROUND

On January 29, 2016, the Court sentenced John C. Slater to one hundred fifteen months' imprisonment, three years of supervised release, $15,000 in restitution, a $100 special assessment, and no fine. *Min. Entry* (ECF No. 75); *J.* (ECF No. 77). This sentence followed Mr. Slater's guilty plea to one count of bank robbery in violation of 18 U.S.C. § 2113(a). *J.* at 1. On June 2, 2017, the First Circuit affirmed Mr. Slater's sentence. *Slip Op. of the Ct. of Appeals* (ECF No. 93); *J.* (ECF No. 94). On October 10, 2017, the United States Supreme Court denied Mr. Slater's petition for a writ of certiorari. *Slater v. United States*, 138 S. Ct. 342 (2017).

On December 22, 2020, Mr. Slater filed a pro se motion for compassionate release. *Mot. for Compassionate Release*, Attach. 1, *Letter to U.S. District Ct.* (ECF No. 98) (*Def.'s Pro Se Mot.*). On December 28, 2020, the Court appointed attorney William Maddox to represent Mr. Slater and ordered Attorney Maddox to file an amended petition for compassionate release within seven days or notify the Court that the case will proceed based on the initial petition. *Appointment of Counsel and Scheduling Order* (ECF No. 101).

On December 31, 2020, Mr. Slater filed an amended motion for compassionate release. *John C. Slater's Mot. for Compassionate Release and Mot. for Modification of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)* (ECF No. 102) (*Def.'s Withdrawn Mot.*). This motion stated that Mr. Slater was in quarantine after being diagnosed with COVID-19. *Id.* at 1. On January 4, 2021, Attorney Maddox clarified that Mr. Slater was in quarantine, but it was unclear whether he had tested positive for COVID-19. *Letter from Att'y William Maddox to the Hon. John A. Woodcock, Jr.* (ECF No. 104). After getting in touch with Mr. Slater, Attorney Maddox informed the Court that Mr. Slater was not positive for COVID-19. *Letter from Att'y William Maddox to the Hon. John A. Woodcock, Jr.* (ECF No. 105). Attorney Maddox further informed the Court that he would file an amended motion for compassionate release on Mr. Slater's behalf after Mr. Slater contacted the Salvation Army, the United States Department of Veteran's Affairs (VA), his son, and his counselor. *Id.*

Attorney Maddox subsequently moved for leave to withdraw his amended motion for compassionate release and to file a second amended motion, which would

include a release plan. *Mot. to Withdraw Mot. for Compassionate Release (ECF # 102)* (ECF No. 106). The Government responded that same day, noting it had no objection to Attorney Maddox withdrawing his motion and refiling without prejudice. *Gov't's Resp. to Def.'s Mot. to Withdraw Mot. for Compassionate Release Re: First Step Act* (ECF No. 107). On January 5, 2021, the Court granted Mr. Slater's motion to withdraw and dismissed his motion for compassionate release without prejudice. *Order* (ECF No. 108).

On January 13, 2021, Mr. Slater refiled his motion for compassionate release. *John C. Slater's Am. Mot. for Compassionate Release and Mot. for Modification of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)* (ECF No. 109) (*Def.'s Mot.*). He attached his medical records from the Bureau of Prisons (BOP) and the July 30, 2020 compassionate release denial from Acting Complex Warden Ma'at. *Id.*, Attach. 1, *Bureau of Prisons Health Servs. Clinical Encounter* (*Med. Records*); *id.*, Attach. 2, *Inmate Req. to Staff Member* (*BOP Denial*). On the same day, Mr. Slater also filed a status report describing the conditions at FCI Oakdale II. *Letter from Attorney William Maddox to the Hon. John A. Woodcock, Jr.* (ECF No. 110). On January 20, 2021, the Government responded in opposition. *Gov't's Opp'n to Def.'s Mot. for Compassionate Release Re: First Step Act* (ECF No. 111) (*Gov't's Opp'n*). On January 27, 2021, Mr. Slater replied. *John C. Slater's Reply to Gov't's Resp. to Am. Mot. for Compassionate Release and Mot. for Modification of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)* (ECF No. 112) (*Def.'s Reply*).

On February 1, 2021, Mr. Slater filed a supplemental reply, attaching additional medical records, and requested a conference of counsel to discuss discrepancies in some documents that the Government had provided. *John C. Slater's Suppl. Reply to Gov't's Resp. to Am. Mot. for Compassionate Release and Mot. for Modification of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)* (ECF No. 113); *id.*, Attach. 1, *Bureau of Prisons Health Servs. Clinical Encounter* (*Suppl. Med. Records*). That same day, the Government filed an explanation of the lack of certain documents and consented to a conference of counsel at the Court's discretion. *Gov't's Notice and Correspondence Concerning Def.'s Req. for Docs. and Status Conference* (ECF No. 114). On February 2, 2021, the Court granted Mr. Slater's request for a status conference. *Order* (ECF No. 115). The following day, the Court held the status conference and the parties resolved the documentary issue. *Min. Entry* (ECF No. 117).

As the Court began to deliberate on Mr. Slater's motion for compassionate release, it was reminded of the extreme impact his crime had on the victims, namely a bank teller whom he threatened to kill and who suffered serious psychological trauma as a result of Mr. Slater's crime. *Order on Victim Notification* at 1 (ECF No. 123). Relying on the spirit of 18 U.S.C. § 3771(a) and its discretion, on February 24, 2021, the Court ordered the Government to inform the Court as to whether it had notified Mr. Slater's victims of his impending motion, and if so, what their positions were. *Id.* at 4. The Court also ordered Mr. Slater to submit his position on victim

notification and whether the Court may properly consider the view of his victims when ruling on his pending motion for compassionate release. *Id.*

On March 2, 2021, the Government informed the Court it had not contacted Mr. Slater's victims and was unaware of their views but acknowledged victim notification was appropriate should the Court require it. *Gov't's Notice and Correspondence Concerning Order on Victim Notification (ECF No. 123)* (ECF No. 124). The following day, Mr. Slater responded and acknowledged victim notification was within the Court's discretion. *Reply to Ct. Order on Victim Notification (ECF #123) and Gov't's Notice and Correspondence (ECF # 124)* (ECF No. 125) (*Def.'s Victim Reply*). On March 4, 2021, the Court ordered the Government to notify Mr. Slater's victims of his pending motion, his health conditions, and the Government's position. *Order Requiring Victim Notification* (ECF No. 126). The Court further ordered the Government to inform the victims that they could submit written statements to the Court regarding the motion if they desired. *Id.*

On March 15, 2021, the Government responded to the Court's March 4, 2021 order and certified its compliance. *Gov't's Notice and Correspondence Certifying Compliance with Order Requiring Victim Notification (ECF No. 126)* (ECF No. 127) (*Gov't's Notice*). The Government attached statements from several victims, including, (1) the teller Mr. Slater threatened during the bank robbery, *id.*, Attach. 1, *Email from Victim 1 to Att'y Lizotte* (*Threatened Teller Statement*); (2) Camden National Bank, the successor-in-interest to the Bank of Maine, *id.*, Attach. 3, *Impact Statement on Behalf of Bank of Maine/Camden National Bank* (*Bank Statement*);

and (3) a second teller who was also present during the bank robbery, *id.*, Attach. 4, *Email from Victim 2 to Att'y Lizotte* (*Second Teller Statement*).

On March 18, 2021, Mr. Slater replied to the Government's notice on victim notification, claiming that the Government's notice was not in compliance with the Court's order to notify the victims of Mr. Slater's health conditions and that it was inappropriate for the Court to consider the statements. *Reply to Gov't Notice (ECF#127) Certifying Compliance with Ct. Order on Victim Notification (ECF # 126)* (ECF No. 128) (*Def.'s Reply on Victim Notification*).

On April 8, 2021, the Court ordered Mr. Slater and the Government to clarify if and when he received a COVID-19 vaccination. *Order* (ECF No. 130). On April 11, 2021, Mr. Slater informed the Court that he received his second COVID-19 vaccination on April 8, 2021 and would be fully vaccinated by April 22, 2021. *Letter from Att'y William Maddox to the Hon. John A. Woodcock, Jr.* (ECF No. 131) (*Vaccination Notice*).

Because Mr. Slater's vaccination notice represented that medical staff at FCI Oakdale II informed him that "unless he receives back surgery he faces the possibility of confinement to a wheelchair for the rest of his life," the Court scheduled a conference of counsel to discuss how to best proceed. *Id.* At the April 13, 2021 conference of counsel, Mr. Slater and the Government discussed the need to obtain further medical records concerning Mr. Slater's back condition and file supplemental memoranda. *Min. Entry* (ECF No. 133). Mr. Slater submitted his supplemental memorandum the next day. *Def.'s Suppl. Mem. 4/14/2021* (ECF No. 134) (*Def.'s*

*Suppl. Mem.*). On April 15, 2021, the Government filed supplemental medical records and indicated it would not respond to Mr. Slater's supplemental memorandum. *Gov't's Notice and Correspondence Concerning Min. Order on Medical Rs. (ECF No. 133)* (ECF No. 135).

On April 16, 2021, Mr. Slater notified the Court that he wanted a copy of the email between AUSA Lizotte and the custodian of Mr. Slater's medical records to verify whether Mr. Slater was actually scheduled for a medical consultation on his back. *Def.'s Suppl. Mem. 4/14/2021 Reply* (ECF No. 136). Mr. Slater also requested psychiatric records. *Id.* On April 20, 2021, the Court issued a status order indicating that it intended to hold Mr. Slater's motion for compassionate release in abeyance pending an upcoming neurological consultation and assessment of Mr. Slater's back conditions. *Status Order* (ECF No. 137). That same day, the Government notified the Court that it furnished a copy of the email referenced in its April 16, 2021 filing to Mr. Slater's counsel. *Gov't's Notice and Correspondence Concerning Status Order on Production of Email (ECF No. 137)* (ECF No. 138).

On April 27, 2021, Mr. Slater filed a document concerning his medical duty status within the BOP. *John C. Slater's Notice re Medical Duty Status Report Dated Mar. 20, 2021* (ECF No. 139). On May 21, 2021, Mr. Slater notified the Court that he had a neurological consult with Dr. Patrick A. Juneau, III, M.D., on April 27, 2021 and attached a three-page report from Dr. Juneau as well as other BOP medical records dated May 6, 2021 and May 19, 2021. *Letter from Att'y William Maddox to the Hon. John A. Woodcock, Jr.* (ECF No. 140) (*Juneau Report*).

On May 25, 2021, the Court held a conference of counsel to determine whether Mr. Slater's motion for compassionate release was ready for decision. *Min. Entry* (ECF No. 142). Attorney Maddox indicated that he needed to confer with his client to determine whether Mr. Slater wanted the Court to consider additional medical records and the Court ordered Attorney Maddox to notify the Court by June 1, 2021 whether it could proceed in ruling on the motion. *Id.*

On May 28, 2021, Mr. Slater informed the Court that he desired to be transferred to another BOP facility where surgeons could perform back surgery on him. *Letter from Att'y William Maddox to the Hon. John A. Woodcock, Jr.* (ECF No. 143). In addition, Mr. Slater said that he wanted the Court to review "a copy of the MRI 'picture'" of his back to decide his motion for compassionate release. *Id.* On June 2, 2021, the Court dismissed Mr. Slater's request to review the imaging of his back because the Court lacked the medical knowledge to interpret the MRI. *Order Dismissing Mot. to Keep R. Open* (ECF No. 144). The Court also noted that the record already contained Dr. Juneau's report concerning the state of Mr. Slater's back. *Id.* Finally, the Court concluded it did not have the authority to order Mr. Slater's transfer between BOP facilities. *Id.* at 4.

In its June 2, 2021 order, the Court observed that if Mr. Slater wished to present additional evidence or further delay the resolution of the motion for compassionate release to obtain additional evidence, he must inform the Court within seven days of the date of the order. *Id.* at 3-4. Mr. Slater did not file anything in

response to this part of the order and the Court is deciding the motion for compassionate release based on the record now before it.

## II.     THE PARTIES' POSITIONS

### A.     John Slater's Motion

Mr. Slater moves for compassionate release due to "his high risk factors related to his age of 73 years old . . . medical conditions including COPD, Parkinson's Disease, asthma, essential hypertension, transient cerebral ischemic attack Type 2 diabetes mellitus, and hyperlipidemia" and "the risk posed to him by the COVID-19 pandemic." *Def.'s Mot.* at 1.

Mr. Slater first notes that he has exhausted his administrative remedies within the BOP and cites an attached denial from his complex warden. *Id.* at 3-4 (citing *BOP Denial*). He then turns to the merits of his motion for compassionate release and begins by recounting his medical conditions. *Id.* at 4. Mr. Slater states that he has COPD and Type 2 diabetes and points out the Centers for Disease Control and Prevention (CDC) have identified these conditions "as increasing the risk of severe illness from the virus that cause[s] COVID-19 . . . ." *Id.* He notes that he also suffers from hypertension, asthma, and a condition known as transient cerebral ischemic attack (mini-strokes), which the CDC has stated may increase the risk of severe complications from COVID-19. *Id.* Mr. Slater also observes that he turned seventy-three years old in January 2021, "which places him at a higher risk category." *Id.* Finally, Mr. Slater says that he has Parkinson's Disease, hyperlipidemia, and Post Traumatic Stress Disorder (PTSD), "which seriously compromises his health

profile." *Id.* He concludes that his "health condition combined with the risk presented to him from his incarceration at FCI Oakdale or other BOP facility, are extraordinary and compelling reasons warranting a reduction." *Id.* at 5.

As for the danger Mr. Slater poses to the community, he states that his "offense record is well documented." *Id.* He then states four possible release plans in order of his preference: (1) "he has sufficient funds to pay for an apartment, transportation and any incidental expenses," (2) "he would reside in Maine under the auspices of the Veteran's Administration's 'Health Care for Re-Entry Veterans' Program and possible auspices of the Salvation Army," (3) "he would reside with the Salvation Army in Louisiana," or (4) a "release plan might be provided through Mr. Slater's son in a location and under circumstances agreeable to the department of probation." *Id.* at 5-6. Mr. Slater concludes by noting he "would submit himself to any additional restrictions and conditions of supervised release with which this Court or his probation officer deem appropriate." *Id.* at 6.

## B. The Government's Opposition

The Government concedes that Mr. Slater has satisfied 18 U.S.C. § 3582(c)(1)(A)'s exhaustion requirement and that Type 2 diabetes and COPD qualify as extraordinary and compelling reasons warranting Mr. Slater's release. *Gov't's Opp'n* at 1. However, the Government contends releasing Mr. Slater is improper because he "remains a danger to the public and the statutory sentencing factors set forth in 18 U.S.C. § 3553(a) weigh against his release . . .." *Id.* Therefore, the Government concludes that "[t]he Court should deny [Mr. Slater's] request for a

reduction in his sentence with prejudice because he has not met his burden to show that a reduction is warranted in light of the danger he would pose to the community and such § 3553(a) considerations." *Id.* at 11.

Regarding the danger that Mr. Slater poses to the community, the Government contends "[t]he through line of [Mr. Slater's] adult life has been recidivism." *Id.* at 12. It observes "[t]here is no indication that [Mr. Slater] is a different person today than he was that day in Hallowell, his status as a septuagenarian with a serious COVID-19 profile notwithstanding." *Id.* The Government points to the fact that Mr. Slater kept his hand on a loaded revolver during the bank robbery and threatened the use of a hand grenade as evidence of his dangerousness. *Id.* The Government also references the discussion in the PSR and at Mr. Slater's sentencing of Mr. Slater's personal background, his lengthy criminal history, lack of employment prospects, "minimal family ties," and "nebulous connections to two of the three communities to which he proposes a return" as weighing against release. *Id.* Moreover, the Government states Mr. Slater "has completed a single class of BOP educational programming, a health class in 2016" and has eleven "moderate severity incident reports." *Id.* at 5. The Government concludes that Mr. Slater does not appear to be "'aging out' of crime" but rather, "[h]is worst crime was his last crime" and that Mr. Slater "does not know why he robbed the Bank of Maine in the first place." *Id.* at 13. Thus, the Government puts forth that "there is no reason to think that [Mr. Slater] will not commit new crimes, and every reason to think that he will." *Id.*

Turning briefly to the section 3553(a) factors, the Government suggests that Mr. Slater "would pose a danger to public safety if released . . .." *Id.* It also argues that the nature and circumstances of Mr. Slater's offense as well as his history and characteristics weigh against release. *Id.* The Government notes that "[a]s of the filing of his Motion, [Mr. Slater] has served 67.6% of his full term and 78.9% of his statutory term." *Id.* Therefore, "[t]he Government submits that permitting [Mr. Slater]'s release from imprisonment after serving 78 months, when the Court's original sentence of incarceration was for 115 months, would undercut 'the seriousness of the offense.'" *Id.* It further suggests that release would not promote respect for the law, provide just punishment, or afford adequate deterrence. *Id.*

## C. John Slater's Reply

In his reply, Mr. Slater first states his understanding that the Government has conceded he meets the exhaustion requirement, is seventy-three years old, and has served "close to if not over 80% of his incarcerative period factoring in good time credits," that his medical conditions present an extraordinary and compelling circumstance justifying release, and that he "has paid off his court-ordered restitution and has sufficient funds to locate and establish suitable housing if released." *Def.'s Reply* at 1-2. Mr. Slater, however, takes issue with the Government's conclusion that he should not be released. *Id.* at 2. He again recounts his medical conditions and then states "[a] panel knowledgeable as to Mr. Slater and his suitability for release into the community has determined that Mr. Slater is at low risk of recidivism." *Id.*

He has attached a BOP record, which states he is low risk for recidivism. *Id.*, Attach. 1, *Inmate Profile* at 2.

Mr. Slater also argues that, contrary to the Government's representation, he has completed "six educational programs while in BOP custody including one in anger management." *Id.* "Mr. Slater stated that since being transferred to FCI Oakdale II he has been prescribed Prozac which has modulated prior anger issues." *Id.* Mr. Slater also attempts to explain some of his disciplinary violations, stating that "he was 'written up' because he had refused to go to 'step-down yard' because this is where gang members were assigned pre-release to protect them from other gang members." *Id.* at 3. Mr. Slater told his counsel "that each cited 'refusal' came after he 'almost got hurt' after having accepted one step-down assignment." *Id.*

Mr. Slater then notes that the Government "has failed to address" all of his proposed release plans, some of which rely on the VA and its relationship with the Salvation Army and "could be utilized to relocate Mr. Slater to The Salvation Army in Maine." *Id.* at 5. Mr. Slater has informed his "counsel that he is not able to utilize the phone to contact either the Veterans Administration of the Salvation Army" due to an ongoing COVID-19 lockdown at FCI Oakdale. *Id.* However, Mr. Slater's counsel states that he has contacted a Veteran Case Manager at the Salvation Army in Shreveport, Louisiana, who represented "that The Salvation Army would welcome Mr. Slater if he is able to contact them." *Id.*

Mr. Slater next refutes the Government's contention that he is a danger to the community. *Id.* He says he is "a wheelchair bound individual" and again observes

that the BOP has categorized him as a low risk for recidivism as of September 8, 2020. *Id.* at 5-6 (citing *Inmate Profile* at 2). Mr. Slater then asks the Government to produce his complete BOP medical records and all prison records relating to the BOP's recidivism evaluation, including a BOP form entitled "Institutional Referral for CCC Placement," Form EF-AO210. *Id.* at 6.

Finally, Mr. Slater contends the section 3553(a) factors weigh in favor of his release. *Id.* He claims that his release would not belie the seriousness of his offense or undermine the deterrent effect of the criminal law because he has served approximately eighty percent of his sentence, when considering good time deductions. *Id.* He also asks the Court to consider his history and characteristics, namely "his service in the Vietnam War and exposure to Agent Orange . . .." *Id.* Again, he points to his BOP-identified low risk of recidivism, arguing that any residual risk can be controlled through "numerous restrictions of supervised release, including the fact that the Court can put him back in prison should he be found to have violated those conditions." *Id.* at 7. He reiterates that he will submit to any additional conditions of supervised release that either the Court or probation deems necessary. *Id.*

### D.    **John Slater's Supplemental Reply**

Mr. Slater's supplemental reply discusses additional medical records that he received after he filed his reply. *Def.'s Suppl. Reply.* Mr. Slater notes that he had an MRI on January 22, 2021, which revealed several spinal conditions. *Id.* at 2 (quoting *Suppl. Med. Records* at 2). He states that his provider, Theresa Savant, FNP, requested an "urgent consult for neurosurgery evaluation" and issued a provisional

diagnosis of "L4-5 lumbar spinal stenosis, disc protrusion, moderately severe DDD"[1] and indicated Mr. Slater's pain is "not adequately controlled with current therapy." *Id.* (quoting *Suppl. Med. Records* at 3).

Mr. Slater further states that the medical records confirm (1) that he has used a wheelchair to get around since April 30, 2020, (2) that he was wounded during the Vietnam War, and (3) takes Prozac concurrently with Cymbalta, and that his back pain medicine—Baclofin—was doubled from 20 mg twice per day to 40 mg twice per day. *Id.* (citing *Suppl. Med. Records* at 1-3, 5, 7-8). In addition, he reiterates that his current health problems include transient ischemic attack, cerebrovascular disease, COPD, asthma, spinal stenosis, unspecified thoracic, thoracolumbar, and lumbosacral intervertebral disc disorder and low back pain. *Id.* at 3 (citing *Suppl. Med. Records* at 6 *et seq.*). Finally, he notes that his medical records list him as having stage three chronic kidney disease, but that it is unclear whether this diagnosis is current or in remission. *Id.* (citing *Suppl. Med. Records* at 12-13).

**E.    The Victim Impact Statements**

As mentioned, the Court ordered the Government to provide notice to Mr. Slater's victims of his pending motion for supervised release and the opportunity to submit their views if they desired. *Order Requiring Victim Notification*. Three victims submitted statements to the Court.

---

[1]    The Court understands "DDD" refers to Degenerative Disk Disease.

### 1. The Threatened Bank Teller

The first victim is a teller who Mr. Slater threatened during the bank robbery. This teller believes that, if released, Mr. Slater "will do it all over again." *Threatened Teller Statement*. She says "[i]t has been almost 7 years since it happened and I still hate the 23rd of every month. I always think of that day. When I hear on TV that a bank or drug store has been robbed I feel sorry for that person, I know what they are going through. I remember that day over again." *Id.* She also mentions that she has "kept a file with all the information about it to see when he is getting out and it scares [her] that he will do it all over again and then another person has to go through this." *Id.* She indicates that the bank robbery has made her concerned about encountering Mr. Slater, writing "[s]till when we are out shopping or riding around I find myself still looking around to see who is there and what might happen." *Id.*

### 2. The Bank of Maine/Camden National Bank

The second victim is Camden National Bank, the successor-in-interest to the Bank of Maine. Christopher Paradis, Camden National Bank's vice president and physical security manager, submitted a statement on the bank's behalf. *Bank Statement*. Mr. Paradis addresses the impact of the robbery on bank staff, writing that Mr. Slater "has forever changed the lives of the branch staff that worked at this branch. Some continue to struggle with the events of the robbery still today." *Id.*

Mr. Paradis then discusses the harm Mr. Slater caused to the bank. He says "Mr. Slater's selfish act has caused countless other stakeholders at the bank to be unnecessarily burdened with efforts required to resolve this issue and not allow them

to focus on the priority of the bank, its customers." *Id.* He also notes that after the robbery, "[t]he Hallowell location had to remain closed for the remainder of the day affecting a customer's ability to cash checks, make deposits, or request financing of any kind." *Id.* Finally, Mr. Paradis requests that "the court . . . consider the physical threat, mental anguish, and excessive burden that Mr. Slater has placed on bank employees, customers, shareholders, and the community." *Id.* He writes, "[t]he bank takes this very seriously and values the safety of anyone that enters its locations and asks that the court take Mr. Slater's actions seriously as well before any early release occurs."

### 3. The Second Bank Teller

The third victim is another teller who was present during the robbery. This teller begins by recounting her memories of the robbery and stating that "[t]o have to relive the event is traumatic." *Second Teller Statement.* The teller states that, following the robbery, "I feared the 23rd of June for the longest time, going into work for days and months after it happening, felt like I was in a movie." *Id.* The teller also writes "I lost a sense of trust in people that I'm not sure I will get back. They tell you to greet people as soon as they walk in so you can deter a robbery, well we did that and it still happens." *Id.*

Addressing the merits of Mr. Slater's motion this teller writes:

One thing I remember is the [demand] note that says "one day I will come back and kill all of you, do you understand?" And now he wants to get out??? So, my opinion on this, is no he should not be released. Why does he get to get released and bring fear back into the people who stole not only our sense of comfort in a job but stole our innocence of not fearing someone is looking for you. I'm sure my opinion on this matter

is a very small part in the decision but I hope whoever is reading this takes a minute to understand the trauma that happened to the three of us that were in the bank with Mr. Slater at that time. 7 years ago may feel like a long time but to us, it[] feels like yesterday.

*Id.*

## F.     John Slater's Response to the Victim Statements

On March 18, 2021, Mr. Slater filed a reply to the Government's certification of the victims' statements.  *Def.'s Reply on Victim Notification.*  Mr. Slater asserts that "the victim statements should not be utilized to assess his motion for compassionate release."  *Id.* at 1.  Mr. Slater raises three grounds: (1) that the Government elicited these statements "in a manner not in compliance with the Court Order;" (2) in 2016, when the victims wrote the victim impact statements at Mr. Slater's original sentencing, they were not provided with Mr. Slater's conditions and were under a misimpression that he was able to follow through on his threat; and (3) the "purposes behind the victim notification statute do not comport with the purposes behind the present proceeding."  *Id.* at 1-2.

## G.     John Slater's Supplemental Memorandum

Mr. Slater's supplemental memorandum, dated April 14, 2021, makes three points in support of his motion for compassionate release.  *Def.'s Suppl. Mem.*  First, Mr. Slater represents that "[s]even circuit courts . . . have held that the [BOP] policy statement at U.S.S.G. § 1B1.13 and the commentary to it are inapplicable to compassionate release requests addressing a prisoner's own motion under 18 U.S.C. § 3582."  *Id.* at 1.  Second, Mr. Slater informs the Court that the CDC issued a "science brief" on April 2, 2021, that concluded "[t]he risks of SARS-CoV-2 infection in fully

18

vaccinated people cannot be completely eliminated in the setting of widespread community transmission of the virus. Vaccinated people could potentially still become infected and spread the virus to others." *Id.* at 6. Third, Mr. Slater claims that his status as a fully vaccinated inmate does not preclude the Court from releasing him. *Id.* at 7 (citing cases).

## III. LEGAL STANDARD

The Court has addressed the legal standard for deciding a motion for compassionate release on numerous occasions. *See, e.g.*, *United States v. Crosby*, No. 1:17-cr-00123-JAW-01, 2020 U.S. Dist. LEXIS 199085, at *16-23 (D. Me. Oct. 27, 2020). Put succinctly, 18 U.S.C. § 3582(c)(1)(A)(i) permits a court to modify a term of imprisonment when (1) "extraordinary and compelling reasons warrant" the movant's release, (2) release is consistent with "the factors set forth in [18 U.S.C. §] 3553(a)", and (3) release comports with "applicable policy statements issued by the Sentencing Commission . . .." 18 U.S.C. § 3582(c)(1)(A).[2]

The movant bears the burden of proving that he is entitled to a sentence reduction, and "the Court has broad discretion in deciding whether to grant or deny a motion for sentence reduction." *United States v. Curtis*, No. 1:14-cr-00140-JAW,

---

[2]     The United States Sentencing Commission issued a policy statement under United States Sentencing Guideline § 1B1.13 for addressing compassionate release motions brought by the Director of the Bureau of Prisons under § 3582(c)(1)(A). However, "[t]he Sentencing Commission promulgated this policy statement before the emergence of the COVID-19 pandemic and before the changes to § 3582 put in place by the FIRST STEP Act." *Crosby*, 2020 U.S. Dist. LEXIS 199085, at *20 n.1. This Court agrees with the vast majority of courts that have held § 1B1.13 "'provides helpful guidance' but 'is not ultimately conclusive given the statutory change.'" *United States v. Rembert*, No. 2:12-CR-66-DBH, 2020 U.S. Dist. LEXIS 210841, at *1 (D. Me. Nov. 11, 2020) (quoting *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 U.S. Dist. LEXIS 115388, at *5 (D. Me. July 11, 2019), *aff'd*, No. 19-1785 (1st Cir. July 23, 2020)); *see United States v. Trenkler*, Cr. No. 92-10369 WES, 2021 U.S. Dist. LEXIS 87567, at *16 (D. Mass. May 6, 2021) (collecting cases).

2020 U.S. Dist. LEXIS 102045, at *12 (D. Me. June 11, 2020) (quoting *United States v. Britton*, 473 F. Supp. 3d 14, 16 (D.N.H. 2020) (internal citations omitted)).

## IV.    FACTUAL BACKGROUND

### A.    The Presentence Investigation Report

When the Court sentenced Mr. Slater, it relied upon a Revised Presentence Investigation Report (PSR) that was prepared by the United States Probation Office (PO). *See Restricted U.S. Probation Filing*, Attach. 2, *Revised Presentence Investigation Report* (ECF No. 100) (*PSR*); *Tr. of Proceedings* at 2:19-9:23 (ECF No. 88) (*Sentencing Tr.*). At his sentencing, Mr. Slater affirmed the PSR is factually accurate, but sought to clarify (1) the circumstances of his involvement with the Texas Department of Corrections, *Sentencing Tr.* at 4:23-6:6, (2) the nature of his conduct leading to a conviction for prison escape in Iowa, *id.* at 6:22-7:24, and (3) an alleged paperwork issue regarding the length of his concurrent sentences in federal and state custody for prior convictions on charges of being a felon in possession of a firearm. *Id.* at 8:7-9:23. The Court adopted the factual portions of the PSR but revised the sentencing guideline calculations to apply the 2015 Guidelines Manual. *Restricted U.S. Probation Filing*, Attach. 3, *Statement of Reasons* at 1 (*Statement of Reasons*).

#### 1.    John Slater's History and Characteristics

John Slater is seventy-three years old. *PSR* ¶ 58. He was born in Independence, Iowa in 1948 to Cecil and Alfhild Slater. *Id.* Mr. Slater's father was a construction contractor who died in 1992 and his mother was a homemaker who passed away in 2001. *Id.* Although Mr. Slater had three sisters and one brother, all

but one is deceased. *Id.* Mr. Slater informed the PO he was raised on a farm and says he has always been a "hard worker." *Id.* ¶ 61.

Mr. Slater dropped out of school as a teenager. *Id.* ¶ 66. Adjudicated delinquent in 1964, he was placed at the Iowa Training School for Boys in Eldora, Iowa. *Id.* ¶ 26. In 1966, then age eighteen, Mr. Slater was convicted of larceny and sentenced to a sixty-day suspended sentence and three years' probation. *Id.* ¶ 27.

On December 4, 1968, Mr. Slater enlisted in the U.S. Marine Corps. *Id.* ¶ 67. He earned his general equivalency degree (GED) while at Camp Lejeune in North Carolina. *Id.* ¶ 66. According to VA records, Mr. Slater was an M-60 machine gunner and became quite upset after killing a number of women and children during the Vietnam War. *Id.* ¶ 67. In Vietnam, he was often under enemy fire and was once medically evacuated. *Id.* Mr. Slater elaborated on his evacuation to the PO, stating that he was wounded in Vietnam and recuperated at a military hospital in Guam. *Id.* At the time of his most recent federal sentencing, Mr. Slater still had frequent flashbacks and nightmares of his experiences in Vietnam. *Id.* He was released from military service on July 14, 1971, with general discharge under honorable conditions. *Id.* Mr. Slater earned standard awards including the Vietnam Star of Valor for his military service. *Id.*

In 1970, Mr. Slater married Suzy Timmish in Cherry Point, North Carolina. *Id.* ¶ 59. Although the couple divorced in Iowa in 1975, their marriage resulted in the birth of Mr. Slater's son who lived in Iowa at the time of Mr. Slater's most recent federal sentencing. *Id.* Mr. Slater told the PO that the birth of his son was the most

emotional time in his life. *Id.* Mr. Slater further informed the PO that he had recently reconnected with his son and had spoken to him on the telephone three weeks before the bank robbery arrest. *Id.* Through his son, Mr. Slater has a grandson whom he has never met. *Id.*

When not incarcerated, Mr. Slater primarily worked as a carpenter. *Id.* ¶ 68. In 1976, Mr. Slater moved from Iowa to Maine, in his words, "just to get away." *Id.* ¶ 60. In 1977, he married Janice McMahon in Bangor, Maine; however, they divorced in 1982 and had no children. *Id.* From 1989 to 1992, Mr. Slater lived with Margaret Nelson and her daughter. *Id.* As the Court will discuss, Ms. Nelson's daughter was the victim of Mr. Slater's two Gross Sexual Assault convictions. *Id.* Mr. Slater reported to the PO that, although he was not the girl's biological father, he raised her as his own and she saw him as a father figure. *Id.* He represented that, following his separation from Margaret Nelson, her daughter requested to live with him part-time. *Id.* As a result, Mr. Slater stated that Ms. Nelson's daughter lived with him for three-and-a-half days per week from 1992 to 1994. *Id.* Despite pleading guilty to sexually assaulting the girl, Mr. Slater told the PO he was falsely accused of the sexual assaults and that "it hurt [him] more than anything in [his] life." *Id.*

Mr. Slater has several chronic mental health conditions. He informed the PO that on a few occasions in the 1970s he was committed to the Bangor Mental Health Institute and the Mental Health Institute in Independence, Iowa due to mental health disorders and serious alcoholism. *Id.* ¶ 63. Although Mr. Slater has been sober since the 1980s, he started drinking alcohol at thirteen and had a serious

alcohol problem from the 1960s until he began Alcoholics Anonymous in 1981. *Id.* ¶ 65. Mr. Slater reported no history of drug abuse to the PO but expressed interest in receiving substance abuse treatment while incarcerated. *Id.*

In 1992, Mr. Slater spent two months in the VA hospital at Togus, Maine due to mental health disorders. *Id.* ¶ 64. The VA diagnosed Mr. Slater with Post-Traumatic Stress Disorder (PTSD) and Bi-Polar Disorder. *Id.* In 1992, the VA also awarded Mr. Slater full disability benefits based on his mental health conditions. *Id.* ¶ 68. Directly prior to his incarceration, Mr. Slater received more than $3,000 in monthly benefits from the VA and Social Security Administration. *Id.* As noted earlier, at the time of his sentencing, Mr. Slater still had serious flashbacks and nightmares regarding his service in the Vietnam War. *Id.* He also reported difficulty sleeping and informed the PO that he saw a counselor each week while incarcerated at the Somerset County Jail. *Id.*

Mr. Slater has numerous health conditions and physical impairments. *Med. Records*; *Suppl. Med. Records.* He has hypothyroidism, Type 2 Diabetes with diabetic neuropathy, hyperlipidemia, PTSD, Major Depressive Disorder, Parkinson's Disease, Transient Cerebral Ischemic Attack, primary hypertension, Cerebrovascular Disease, asthma, Chronic Obstructive Pulmonary Disease (COPD). *Suppl. Med. Records* at 8-10. Mr. Slater also suffers from polyarthritis and spinal stenosis and relies on a wheelchair and a rolling walker to get around. *Id.* at 10-11.

A record dated January 13, 2021, describes Mr. Slater's physical limitations in greater detail. *Id.* at 1-4. FNP Theresa Savant noted Mr. Slater has a history of

"chronic pain" which had not abated despite treatment with prescription medication. *Id.* at 2. FNP Savant further noted that Mr. Slater reported "increased pain when seated in [his] wheelchair, as [the seat is] lower than [the] seat on [his] rolling walker." *Id.* She indicated Mr. Slater "was already being pushed in [his] wheelchair to chow/pill line moves." *Id.*

An addendum to the record indicates that Mr. Slater had an MRI of his back on January 13, 2021, which revealed "mild acquired lumbosacral spinal stenosis" with "broad based right posterolateral disc protrusion producing right sided lateral recess and foraminal encroachment" at his L4-5 vertebrae. *Id.* He also had "moderately severe bilateral facet [Degenerative Disc Disease] with ligamentous hypertrophy" and "[a]symmetric right L5-S1 facet arthropathy." *Id.* The MRI note indicates "[p]osteroinferior right L5-S1 facet ganglion is present on the right" but it "[d]oes not affect the exit foramen nerve root." *Id.* There was no evidence of significant Degenerative Disc Disease or disc herniation in his thoracic spine. *Id.* FNP Savant wrote that there were consults pending for neurology and an orthopedist but that she would double-check and request a neurosurgery consultation. *Id.* To alleviate his persistent back pain, she also increased Mr. Slater's dose of Baclofen to the maximum possible dose. *Id.* at 2-3.

In her request for a neurosurgery consultation, FNP Savant indicated that her request was "urgent" because Mr. Slater's "pain is not adequately controlled with current therapy." *Id.* at 3. The consult request also notes Mr. Slater is "[m]obile per rolling walker for short distances, pushed in wheelchair to chow/pill line moves." *Id.*

FNP Savant rendered a provisional diagnosis of "L4-5 lumbar spinal stenosis, disc protrusion, moderately severe DDD." *Id.*

On April 27, 2021, Dr. Patrick A. Juneau, III, M.D., FACS, FAANS, reviewed Mr. Slater's January 13, 2021 MRI and reported his findings. *Juneau Report* at 2-4. The report indicates Mr. Slater "has a history of claw hand and claw foot[], . . . lower back pain, COPD, hypothyroidism, hyperlipidemia, Parkinson's disease, and [transient ischemic attack]." *Id.* at 3. In addition, Mr. Slater "has a history of hypertension, diabetes, asthma, arthritis, astigmatism, and presbyopia" and "has undergone repair of a gunshot wound to his left arm." *Id.*

Turning to Mr. Slater's back condition, Dr. Juneau's report affirms that he reviewed the January 13, 2021 MRI of Mr. Slater's lumbar spine. *Id.* at 3. He indicates that Mr. Slater "does have some moderate spinal canal stenosis at the L4-5 level" and that "[t]he spinal canal stenosis is due to bony facet hypertrophy and thickening of the underlying ligamentum flavum." *Id.* The report further states that Mr. Slater "has severe right foraminal stenosis due to some bulging of the disc and thickening of the ligamentum flavum" and that "[o]n axial image #25, the right L4-5 neural foreman is occluded." *Id.*

Dr. Juneau's "impression [is] that [Mr.] Slater presents with a history of lumbar neurogenic claudication, worse in the right leg than in the left leg." *Id.* He says that Mr. Slater "can't walk for any significant distances without having the onset of symptoms in his legs." *Id.* Dr. Juneau recommends that Mr. Slater "undergo some outpatient physical therapy to his lower back, as well as a series of lumbar epidural

steroid injections." *Id.* at 4.  Dr. Juneau says that if Mr. Slater "does not respond favorably to these non-operative treatments, then . . . he would be a candidate for . . . L4, L5 bilateral decompressive laminectomies with right sided foraminotomies." *Id.*

### 2.  John Slater's Criminal History

Mr. Slater has a uniquely extensive criminal history.  On January 3, 1964, Mr. Slater was declared delinquent at the age of fifteen and placed at the Iowa Training School for Boys and Eldora, Iowa.  *PSR* ¶ 26.  Records indicate Mr. Slater was paroled on September 11, 1964, but on December 8, 1964, his parole was revoked for unknown reasons.  *Id.*  He was paroled again on January 14, 1965 and discharged from the juvenile justice system on January 2, 1967.  *Id.*  On May 30, 1966, Mr. Slater was arrested for Larceny in the Nighttime in Independence, Iowa.  *Id.* ¶ 27.  He received a suspended sentence of sixty days in jail and three years' probation.  *Id.* His probation was revoked for unknown reasons on August 11, 1966.  *Id.*

Mr. Slater's next criminal conviction, this time for Embezzlement or Fraudulent Conversion of Property in Iowa, occurred in 1972 after his honorable discharge from the U.S. Marine Corps.  *Id.* ¶ 28.  Mr. Slater received a five-year suspended sentence and two-year term of probation.  *Id.* According to Court documents, Mr. Slater had been a salesman and had fraudulently converted proceeds belonging to the Norris Equipment Company.  *Id.*  Court records also noted Mr. Slater had mental health problems and was voluntarily committed to the Mental Health Institute in Independence, Iowa on a few occasions.  *Id.*  Mr. Slater explained to the PO that he had just returned from Vietnam and was drinking heavily around the

26

time of this offense. *Id.* On June 26, 1973, Mr. Slater had his probation revoked for writing bad checks and for leaving Iowa twice without permission. *Id.* He went to prison in Iowa to serve his five-year sentence. *Id.*

On August 26, 1974, Mr. Slater escaped from the Anamosa Men's Reformatory in Anamosa, Iowa. *Id.* Due to the age of this case, the PO could not obtain many details about the escape. *Id* ¶ 29. Mr. Slater says he was permitted to go home on furlough but never reported back to prison. *Id.* He claims that he turned himself in to the authorities several months later. *Id.* Records show authorities apprehended Mr. Slater on November 5, 1974, and on May 9, 1975, he was sentenced to one year at the Iowa Men's Reformatory, consecutive to his other sentences. *Id.* He was released from Iowa state custody on September 28, 1976. *Id.* ¶ 28.

Mr. Slater turned up in Maine approximately one year after his release from state custody in Iowa. On November 19, 1977, Maine law enforcement arrested Mr. Slater for Theft by Deception. *Id.* ¶ 30. Records from the Penobscot County Superior Court reflect that on November 19, 1977, he attempted to buy a motor vehicle valued in excess of $5,000 by using a fraudulent bank check. *Id.* On February 21, 1979, Mr. Slater received a nine-month sentence, all but thirty days suspended, and one year of probation. *Id.* According to the PSR, Mr. Slater employed a similar scheme—using stolen, forged, fraudulent, or bad checks to purchase cars and motorcycles—five more times over the next thirty-two years. *Id.* ¶¶ 33, 35, 42, 44-45.

Mr. Slater's first firearms offense was in 1978.  *Id.* ¶ 31.  Court documents say Mr. Slater unlawfully possessed a .300 caliber Savage rifle and was arrested on November 8, 1978.  *Id.*  On April 27, 1979, he received an eleven-month suspended sentence, two years of probation, and a $500 fine in Somerset County Superior Court in Skowhegan, Maine.  *Id.*

Just three days after receiving a suspended sentenced for the firearms offense, Mr. Slater stole property valued in excess of $1,000 from G & L Produce.  *Id.* ¶ 32.  Approximately one month later, on June 7, 1979, he stole a 1977 Honda motorcycle valued at approximately $2,390 from Shepard Datsun in Thomaston, Maine. *Id.* ¶ 33.  On August 1, 1979, Mr. Slater received a two-year sentence for these two thefts and his probation on the firearms offense was revoked.  *Id.* ¶¶ 31-33.  He was released from prison two days before Christmas in 1980.  *Id.* ¶¶ 31-33.

Three years later, on July 30, 1983, Mr. Slater was arrested in Texas and charged with Automobile Theft.  *Id.* ¶ 34.  Court records reflect that on May 29, 1983, Mr. Slater stole a truck valued between $200 and $10,000.  *Id.*  On September 29, 1983, he received an eight-year prison sentence but was paroled a week later for unknown reasons.  *Id.*  On July 24, 1985, Mr. Slater's parole was revoked for unknown reasons.  *Id.*  He was paroled again on August 6, 1986 and revoked again on September 7, 1988, both for unknown reasons.  *Id.*  His parole for this offense expired on August 19, 1991.  *Id.*

By August 24, 1985, Mr. Slater had returned to Maine.[3]  *Id.* ¶ 35.  That day, he was arrested for Theft by Deception after he fraudulently obtained the property of Patricia Ormsby, doing business as Butler's Garage, valued in excess of $5,000 by using a fictitious bank check.  *Id.*  On March 11, 1986, he received a seven-year prison sentence, all but five years suspended, and two years of probation.  *Id.*

On January 12, 1989, Mr. Slater stole a 1977 Oldsmobile Cutlass from his girlfriend, Margaret Nelson.  *Id.* ¶ 36.  He also stole a $500 bank check from Ms. Nelson and forged her signature on the check.  *Id.*  He was charged with one count of Unauthorized Use of Property, one count of Theft by Unauthorized Taking or Transfer, and one count of Forgery.  *Id.*  On April 3, 1989, he was sentenced to three hundred sixty-four days imprisonment for the Forgery and Unauthorized Use of Property counts, to be served concurrently, and six months on the Theft count, to be served concurrently, and he had his probation revoked for the Butler's Garage Theft by Deception offense.  *Id.* ¶¶ 35-36.  He was sentenced to two years of imprisonment on the probation revocation.  *Id.* ¶ 35.

Mr. Slater had another theft conviction in 1991.  *Id.* ¶ 37.  Documents from the Somerset County Superior Court in Skowhegan reflect that on January 18, 1991, Mr. Slater stole financial records and $600 in cash from Forest City Resources Group Homes in Embden, Maine.  *Id.*  On March 12, 1991, he was sentenced to two years'

---

[3]  The Court wonders how this sequence occurred.  Pursuant to the preceding paragraph, Mr. Slater should have been incarcerated in Texas at this time for his July 24, 1985 parole revocation at this time.  Nevertheless, the Court has previously adopted the facts in the PSR and accepts that, regardless of how he got there, by August 24, 1985, Mr. Slater was at liberty in Maine.

imprisonment, all but forty-five days suspended, eighteen months' probation, and a $500 fine. *Id.*

In 1994, Mr. Slater was convicted of nine crimes. *Id.* ¶¶ 38-41. On April 30, 1994, Mr. Slater sold a Wheelhorse lawn tractor with mower and snowblower attachments to Lauri Fisher for $3,900. *Id.* ¶ 38. However, Mr. Slater failed to disclose that the equipment was subject to a $4,891.53 lien by Skowhegan Savings Bank. *Id.* He was charged with Theft by Unauthorized Taking and sentenced to three years' imprisonment on August 23, 1995. *Id.*

On May 26, 1994, Mr. Slater was arrested for Unauthorized Use of Property. *Id.* ¶ 39. The facts surrounding this case are not in the PSR. *Id.* On November 8, 1994, he received a sixty-day prison sentence, concurrent with his other sentences. *Id.* On August 17, 1994, Mr. Slater was arrested for Driving After Suspension. *Id.* ¶ 40. Mr. Slater claimed that he was unaware his license was suspended and said his girlfriend had never given him the suspension letter. *Id.* He received a sixty-day prison sentence, concurrent with his other sentences. *Id.*

On September 4, 1994, Mr. Slater was involved in a physical altercation with Chris Reynolds, his ex-girlfriend's daughter's boss. *Id.* ¶ 41. The altercation resulted in Mr. Slater's conviction on six counts: (1) Possession of a Firearm by a Felon; (2) Terrorizing; (3) Carrying a Concealed Weapon; (4) Operating After Suspension; (5) Violation of Condition of Release; and (6) Terrorizing. *Id.* Mr. Slater possessed a 9mm Glock Model 17 semi-automatic handgun and a Colt Government Mustang .380 handgun, threatened to kill Chris Reynolds, carried concealed weapons, operated a

motor vehicle after suspension, violated a condition of release, and threatened to kidnap and murder his ex-girlfriend's daughter. *Id.*

When the PO asked Mr. Slater about this offense, he said that he "pistol whipped" his ex-girlfriend's daughter's boss after he learned the two were having sexual relations. *Id.* Mr. Slater further asserted that Mr. Reynolds was twenty-seven and married, while the girl was a minor. *Id.* Mr. Slater claims he alerted the Sheriff's Department of Mr. Nelson's inappropriate relationship with the girl, but they did not investigate. *Id.* Mr. Slater took matters into his own hands. *Id.* On November 8, 1994, Mr. Slater received a five-year prison sentence, all but nine months suspended on count 1, and sixty days in jail, concurrent with each other on the remaining counts. *Id.*

In 1995, Mr. Slater was charged with gross sexual assault. *Id.* ¶ 42. Court records reflect that between January 1, 1990 and July 31, 1994, Mr. Slater engaged in oral sex and sexual intercourse with his ex-girlfriend's daughter, then aged between fourteen and seventeen. *Id.* Mr. Slater pleaded guilty to two counts of a five-count indictment and, on August 23, 1995, received a fourteen-year sentence with all but seven years suspended, along with six years of probation. *Id.* Although Mr. Slater pleaded guilty to these two counts and is a lifetime registrant on the Maine Sex Offender Registry, he maintains his innocence and claims his lawyer persuaded him to plead guilty early on. *Id.*

On September 8, 1999, Mr. Slater was released from custody. *Id.* Approximately one month later, on October 7, 1999, he wrote a bad check for $7,000

and bought a 1991 Ford Bronco from Varney GMC in Bangor, Maine. *Id.* He was later arrested for violating conditions of his probation and, on May 3, 2000, he was ordered to serve six months custody with credit for time served and his probation was continued. *Id.* On July 24, 2000, a second motion to revoke his probation was filed alleging that Mr. Slater had stolen a vehicle in Newport, Maine on July 15, 2000, and left the state without permission. *Id.* The authorities were unable to locate Mr. Slater until his October 13, 2000 arrest in his first federal case. *Id.*

On October 13, 2000, Mr. Slater was arrested for his first federal offense – Possession of a Firearm by a Felon. *Id.* ¶ 43. As just described, Mr. Slater was on probation for gross sexual assault during the summer of 2000 and supervised by the Maine State Probation Office in Bangor. *Id.* In July 2000, he fled Maine and stole several cars. *Id.* He eventually returned to Maine and, on October 13, 2000, was arrested in the remote town of Kokadjo. *Id.* Following his arrest, Mr. Slater told law enforcement there was a loaded pistol in his car. *Id.* The authorities searched a Dodge Viper parked outside the lodge where Mr. Slater had been staying and located a Jennings .22 caliber semi-automatic pistol. *Id.* Mr. Slater had purchased the pistol in a private sale in Hampden, Maine through the Uncle Henry's sales guide. *Id.* He received a sixty-month sentence, followed by three years of supervised release. *Id.*

On October 17, 2008, Mr. Slater was arrested for First-Degree Theft. *Id.* ¶ 44. Three days before his arrest, Mr. Slater submitted a $12,500 check to Recker Auto Sales for the purchase of a 2003 Chevrolet Tahoe, then drove off the lot with the car. *Id.* Recker Auto Sales soon determined Mr. Slater had written the check on a

closed account. *Id.* Authorities issued a nationwide warrant for Mr. Slater's arrest. *Id.* On October 17, 2008, law enforcement apprehended Mr. Slater in Amherst, Ohio. *Id.* In Iowa state court, Mr. Slater pleaded guilty to the First-Degree Theft charge. *Id.* He was sentenced to ten years' imprisonment, all suspended, five years of probation, loss of the right to vote, $2,130 in restitution, and a $1,000 fine. *Id.*

On October 6, 2009, Mr. Slater's probation in Iowa was revoked after a September 16, 2009 arrest in Cedar Rapids, Iowa for Forgery. *Id.* ¶¶ 44-45. Mr. Slater pleaded guilty to stealing two checks and forging one check for $8,205.69 to buy a motorcycle. *Id.* ¶ 45. There is limited information about this case, but on December 21, 2009, Mr. Slater was sentenced to two years of imprisonment and a $625 fine. *Id.*

### 3.  Nature and Circumstances of the Offense

#### a.  Count One: Bank Robbery

On June 23, 2014, at the age of sixty-six, Mr. Slater robbed the Bank of Maine's Hallowell branch and escaped with $15,000 in brand new $100 bills. *PSR* ¶¶ 4, 58. Upon arriving at the scene, investigating officers from the Hallowell Police Department learned that a male customer had entered the bank and told a teller that he wanted to open a savings and checking account. *Id.* ¶ 4. The teller led the man into an office and began the process of opening an account. *Id.* When the teller asked the man for his identification, he handed her a note written on a piece of lined paper, with a pink pattern along the left edge. *Id.* The note read:

Im Here to <u>Rob</u> your Bank, no <u>Silent</u> <u>Alarms</u> my cell phone rings, your all dead, I have a hand grenade and a gun, no marked bills or inked, if so, one day I will come back and kill all of you, do you understand???

*Id.*

Then, the man said to the teller, "I'm sick. I want $15,000. I don't care, I'll shoot. Now you didn't set off the alarm? If you did, my phone will go off." *Id.* The teller got up from her desk and informed the bank manager that they were being robbed. *Id.* Together, the teller and the bank manager retrieved $15,000 in $100 bills and gave Mr. Slater the money. *Id.* Mr. Slater was not arrested at the scene, despite parking his car only a short distance from the bank, directly across the street from the Hallowell Police Department. *Id.* ¶ 8.

Following the bank robbery, law enforcement circulated pictures of the robber to the public. *Id.* ¶ 5. Over the next few days, several witnesses came forward and identified the robber as John Slater. *Id.* Law enforcement learned that Mr. Slater was in the process of moving from an apartment on Western Avenue in Augusta, Maine to a mobile home in Gardiner, Maine. *Id.* On June 26, 2014, law enforcement obtained search warrants for both residences, which the Federal Bureau of Investigation (FBI), Hallowell Police Department, Maine State Police (MSP), Gardiner Police Department, and Augusta Police Department executed the next day. *Id.* ¶ 6.

Mr. Slater was not present for either search. *Id.* ¶¶ 6-7. Law enforcement seized a straw hat, brown jacket, latex gloves inside the brown jacket, a briefcase, sunglasses, brown shoes, receipts, documents, an excise tax receipt, and a U-Haul

receipt from the Gardiner mobile home. *Id.* ¶ 6. At the Augusta residence, law enforcement found a Bank of Maine cash bag, brown pants, a gun cleaning kit, stationary with pink trim that matched the demand note from the robbery, a fifty-count box of .32 caliber Smith and Wesson ammunition with five rounds missing, and a black belt. *Id.* ¶ 7. The cash and Mr. Slater were nowhere to be found.

Mr. Slater was a fugitive for approximately two weeks after the bank robbery. Immediately following robbery, Mr. Slater went to Central Maine Motor Sports in Lewiston, Maine and bought a 2002 Yamaha V-Star 1100 motorcycle for approximately $6,600. *Id.* ¶ 8. He also bought approximately $1,200 worth of furniture for his mobile home in Gardiner. *Id.* He spent some of the remaining stolen money on food, cigarettes, and hotels. *Id.* Mr. Slater told law enforcement that he spent the first few days after the robbery at his new mobile home in Gardiner. *Id.* ¶ 9. However, on June 26, 2014, he read a newspaper article about the bank robbery and decided to flee. *Id.* He spent that night at a hotel in Lancaster, New Hampshire. *Id.* On June 27, 2014, he arrived in Syracuse, New York and spent the night. *Id.* June 28, 2014 was a travel day. *Id.* On June 29, 2014, Mr. Slater toured the Pro Football Hall of Fame in Canton, Ohio, and spent the night in Canton. *Id.*

On June 30, 2014, Mr. Slater began to drive his motorcycle back East. *Id.* On July 1, 2014 he spent the night in Clayton, New York. *Id.* The next night, he stayed at a cabin in a small town in Vermont. *Id.* On July 3, 2014, he arrived in Twin Mountain, New Hampshire, where he remained for nearly a week until law enforcement arrested him on July 9, 2014. *Id.*

On July 9, 2014, FBI agents and an MSP task force officer arrested Mr. Slater at the Twin Mountain Motor Court in Twin Mountain, New Hampshire pursuant to a federal arrest warrant. *Id.* ¶ 8. Before agents were able to advise Mr. Slater of his rights he said "how did you find me?" and "I knew I shouldn't have done it." *Id.* Mr. Slater told the officers he did not have a weapon on his person but that there was a gun in his cabin. *Id.* Officers searched his person and discovered $1,592.00 in cash. *Id.* Mr. Slater told the officers there was another $1,500 in his backpack. *Id.*

Mr. Slater waived his *Miranda* rights and agreed to discuss the bank robbery. *Id.* He explained that he robbed the Bank of Maine's Hallowell location because it was the closest bank to his home. *Id.* He parked his car nearby, right across the street from the Hallowell Police Department. *Id.* Mr. Slater admitted that he had a gun in his jacket pocket during the robbery and kept his hand on it throughout. *Id.* He remarked to the officers that he should have gotten more money from the robbery, but he had not expected that the teller would ask him how much money he wanted. *Id.* Mr. Slater commented that if he were more dangerous, he would have shot the teller after she told another bank employee the bank was being robbed. *Id.* He told the officers that he only had $2,500 remaining of the $15,000 that he had obtained during the robbery. *Id.* The officers showed Mr. Slater a copy of the demand note, which he confirmed that he had written on the morning of the robbery. *Id.* He admitted that he never had a grenade, but thought it was more threatening than just a gun. *Id.*

Mr. Slater purchased the gun, a .32 caliber five-shot Smith and Wesson revolver, through a private sale in Belfast, Maine. *Id.* ¶ 10. He acknowledged that he was not permitted to possess a firearm and had already served time in prison for a prior conviction for Felon in Possession of a Firearm. *Id.* After the officers arrested Mr. Slater, the cabin's owner consented to a search of the cabin where he was hiding out. *Id.* Officers seized $1,000 in banded $100 bills, a loaded .32 caliber five-shot Smith and Wesson revolver, various receipts including a receipt from Central Maine Power Sports for $5995.42 dated June 23, 2014 and a furniture store receipt for $1,223.59. *Id.*

Mr. Slater told law enforcement that he did not know why he robbed the bank but stated he had not been taking his prescription medication for bipolar disorder. *Id.* ¶ 9. He said that he was wearing a corduroy jacket, blue jeans, a brown shirt, and hat during the robbery and was also carrying a briefcase. *Id.* He said he had intended to wear latex gloves but struggled to put them on his hands, so he stashed them in the pocket of his jacket. *Id.* He said he wished that he had not committed the robbery and was planning on turning himself in the following day. *Id.*

### b. Guideline Calculations

The Court determined that Mr. Slater was a Criminal History Category V with a Total Offense Level of 24. *Statement of Reasons* at 1. More than twenty of Mr. Slater's criminal convictions did not count toward his criminal history category because they had aged out. *Sentencing Tr.* at 33:23-24. The applicable sentencing guideline range was ninety-two to one hundred fifteen months' imprisonment, one to

three years of supervised release, a fine between $10,000 and $100,000 and a special

assessment of $100. *Statement of Reasons* at 1. The Court sentenced Mr. Slater to

one hundred fifteen months' imprisonment, three years of supervised release, $15,000

in restitution, a $100 special assessment, and no fine. *Min. Entry* (ECF No. 75). On

June 2, 2017, the First Circuit upheld this sentence as procedurally and substantively

reasonable. *United States v. Slater*, 694 F. App'x 813, 817-18 (1st Cir. 2017).

## V.    DISCUSSION[4]

The Court's analysis of the merits of Mr. Slater's motion for compassionate

release proceeds in three parts. First, as a threshold matter, the Court reviews and

overrules Mr. Slater's objections to the Court considering the victim impact

statements the Government provided. Second, the Court analyzes whether

Mr. Slater has shown extraordinary and compelling reasons warranting his release

and concludes he has not. Third, the Court considers the sentencing factors set forth

in 18 U.S.C. § 3553(a) and finds they do not support release. Thus, the Court

concludes Mr. Slater does not qualify for compassionate release and dismisses his

motion without prejudice.

### A.    The Victims' Statements

The Court first turns to Mr. Slater's objections to the Court's consideration of

the victim statements from the two tellers and the bank in evaluating his motion for

---

[4]      18 U.S.C. § 3582(c)(1)(A) contains a mandatory claim processing rule, which bars some
compassionate release motions as untimely. *See Crosby*, 2020 U.S. Dist. LEXIS 199085, at *17 (citing
*United States v. Lugo*, No. 2:19-cr-00056-JAW, 2020 U.S. Dist. LEXIS 63673, at *3 (D. Me. Apr. 10,
2020)). The Government concedes that Mr. Slater has exhausted his administrative remedies. *Gov't's
Opp'n* at 1. Therefore, the Court addresses the merits of Mr. Slater's motion.

compassionate release. The Court firmly rejects Mr. Slater's demand that the victim statements not be considered at all. First, although Mr. Slater now recites the caselaw that the Court discussed in its February 24, 2021 order on victim notification, Mr. Slater waived the right to object to the victim notification in this case by stating that he "leaves notification of the victims to the sound discretion of the Court," only urging that the Government convey to the victims "his sincere remorse." *Def.'s Victim Reply* at 2. If Mr. Slater wished to object to the Court's discretionary decision to hear from the victims, he should have done so on March 3, 2021. In any event, as the Court noted in its February 24, 2021 order, the question here is not whether victims have a right to be heard during compassionate release proceedings, but whether a court has the authority to order that crime victims be contacted and to consider their responses. On this legal issue, as Mr. Slater himself conceded, there is no basis to conclude that the Court's authority is so limited.

Mr. Slater's second and third objections misconstrue the nature of victim statements. Under 18 U.S.C. § 3771, as the Court pointed out in its February 24, 2021 order, a victim has the right to be "reasonably protected from the accused," the right to "reasonable, accurate, and timely notice of any public court proceeding," and the right to be "reasonably heard at any public proceeding in the district court involving release." 18 U.S.C. § 3771(a)(1), (2), (4). In general, the victim has the right to "be treated with fairness and with respect for the victim's dignity and privacy." 18 U.S.C. § 3771(a)(8). The Court does not need to resolve whether Mr. Slater's motion for compassionate release and the filings related to that motion amount to a

"public court proceeding" under 18 U.S.C. § 3771(a) because even if the Crime Victims' Rights Act does not technically apply (and the Court expresses no view on this issue), the Court would still exercise its discretion in informing the victims of Mr. Slater's motion for compassionate release and would take their responses into account in assessing the merits of his motion, especially in view of the direct threat that Mr. Slater made against the victims at the time of the crime and his promise to return and exact vengeance on them upon his release. Furthermore, the Court views the provisions of the Crime Victims' Rights Act as a useful guide for assessing the victim statements in this case and therefore turns to the Crime Victims' Rights Act.

Under the Crime Victims' Rights Act, a victim is not a typical fact witness. To exercise the right to be heard at a criminal proceeding, the victim typically does not need to have access to a defendant's PSR, to understand how the sentencing judge calculated the sentencing guideline range, or to place the defendant's actions in the context of the perpetrator's life. *See In re Brock,* No. 08-1086, 262 F. App'x. 510, 512 (4th Cir. Jan. 31, 2008) (per curiam) (unpublished) (stating that district court did not abuse its discretion in denying the victim access to portions of the PSR because he could meaningfully exercise his right to be reasonably heard without such access); *accord In re Kenna,* 453 F.3d 1136, 1137 (9th Cir. 2006) (per curiam) (holding that neither the CVRA's language nor the legislative history supported a victim's argument that the CVRA confers a general right for victims to access the PSR).

Instead, the right "to be reasonably heard," 18 U.S.C. § 3771(a)(4), as the Third Circuit has described it, is "in the nature of an independent right of allocution at

sentencing." *United States v. Ausburn*, 502 F.3d 313, 323, n.17 (3d Cir. 2007) (quoting *United States v. Vampire Nation*, 451 F.3d 189, 197, n.4 (3d Cir. 2006)). As the Ninth Circuit explained, the victim's statutory right to speak at a sentencing hearing effectuates statutory ends, including "(1) To ensure that the district court doesn't discount the impact of the crime on the victims; (2) to force the defendant to confront the human cost of his crime; and (3) to allow the victim 'to regain a sense of dignity and respect rather than feeling powerless and ashamed.'" *Kenna v. United States Dist. Ct.*, 435 F.3d 1011, 1016 (9th Cir. 2006) (quoting Jayne W. Barnard, *Allocution for Victims of Economic Crimes*, 77 NOTRE DAME L. REV. 39, 41 (2001)).

Here, when the bank teller exercised her right to be heard under the Crime Victims' Rights Act at Mr. Slater's sentencing hearing and when the victims wrote the Court voicing their concerns about his early release, they were and are entitled to be heard on Mr. Slater's sentence because Mr. Slater had not just committed a crime, but a crime in which they were the victims. Nor are their statements subject to exclusion based on a lack of foundation. Mr. Slater generated an ample foundation for their victim statements when he committed an armed bank robbery on June 23, 2014.

The Court acknowledges that it appears the Government did not provide the victims with a detailed recitation of Mr. Slater's current medical condition. It is possible that if the victims knew more about his current level of disability, they might be less fearful about his release, which is why the Court required the Government to provide this information. In effect, however, Mr. Slater's objections to the supposed

lack of foundation for the victims' statements go to the weight, not their admissibility. Thus, in the Court's view, the Government's apparent failure to comply with the court order does not undercut the force of the victims' statements, which are based on what Mr. Slater communicated to them during the bank robbery, his threat to harm them then, and his promise to return and harm them upon release. Moreover, Mr. Slater's contradictory position—that the is acutely remorseful about the impact of his violent crime upon his victims and his insistence that the Court may not even consider the victims' statements about the ongoing impact of his crime on their lives—is not an effective response. The Court overrules Mr. Slater's objections to the victim statements.

### B.  Extraordinary and Compelling Reasons

To grant Mr. Slater's motion under 18 U.S.C. § 3582(c)(1)(A)(i), the Court must find "extraordinary and compelling reasons warrant[ing]" a reduction in sentence. Mr. Slater's initial motion claimed that his numerous medical conditions increase his risk of serious illness and death from COVID-19 infection and are therefore extraordinary and compelling reasons for his release. *Def.'s Mot.* at 4. In more recent submissions, however, Mr. Slater has emphasized the severity of his back problems and the need for surgery that he says the BOP is unwilling or unable to provide. *Def.'s Suppl. Reply* at 2; *Vaccination Notice* at 1. The Court considered both arguments and concludes each lacks merit.

### 1. John Slater's Risk of Serious COVID-19 Infection

The first consideration is Mr. Slater's risk of COVID-19 infection, serious illness, and death. Prior to Mr. Slater's COVID-19 vaccination, the Government conceded that his COPD and Type 2 diabetes qualify as "extraordinary and compelling reasons" warranting his release "in that at this time [Mr. Slater's] ability to provide self-care against serious injury or death as a result of COVID-19 is substantially diminished, within the environment of a correctional facility, by the chronic conditions themselves." *Gov't's Opp'n* at 11.

Guidance from the Centers for Disease Control and Prevention (CDC) supports the Government's concession due to Mr. Slater's age and medical conditions. *See Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited June 28, 2021) (explaining that elderly individuals face an elevated risk of severe complications from COVID-19); *see also People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited June 28, 2021) (*CDC COVID Med. Conditions*) (listing chronic kidney disease, COPD, heart conditions, and Type 2 diabetes as conditions that may increase a defendant's risk of COVID-19).

Even so, the Court declines to accept the Government's concession, which it made before Mr. Slater's COVID-19 vaccination. Because Mr. Slater is fully vaccinated, the Court concludes the risk to Mr. Slater from COVID-19 is not an "extraordinary and compelling" reason for his release. *Vaccination Notice* at 1.

According to the CDC, "COVID-19 vaccines are effective at preventing COVID-19 disease, especially severe illness and death."  *When You've Been Fully Vaccinated*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html (last visited June 28, 2021).  Due to the effectiveness of the COVID-19 vaccines, the Court concludes Mr. Slater failed to demonstrate extraordinary and compelling reasons for his release.  *Accord United States v. Vicente*, No. 1:16-cr-00077-JAW, 2021 U.S. Dist. LEXIS 104466, at *13 (D. Me. June 3, 2021) (collecting cases).

Mr. Slater challenges that being fully vaccinated does not preclude his release because of the possibility that he could contract a variant of the virus, particularly in a communal living setting such as a federal prison.  *Def.'s Suppl. Mem.* at 6-7.  To the extent such a risk exists, Mr. Slater has not shown the risk is "extraordinary and compelling."  Mr. Slater is housed in FCI Oakdale I where no inmates are currently positive for COVID-19; however, five BOP staff members at FCI Oakdale I are positive.  *COVID-19 Coronavirus*, BOP, https://www.bop.gov/coronavirus/ (last visited June 28, 2021).  Moreover, one thousand fifty-one inmates and one hundred fifty-five BOP staff at the broader FCI Oakdale I complex, FCC Oakdale, have been fully vaccinated against COVID-19.  *Id.*

Given the low incidence of COVID-19 cases and high rate of COVID-19 vaccination at FCI Oakdale I, the Court concludes Mr. Slater's risk of COVID-19 infection is not an extraordinary and compelling reason for his release.  Viewing these statistics alongside Mr. Slater's vaccination, the Court finds the risk Mr. Slater will

contract COVID-19 is low, and the risk that he will experience a serious COVID-19 infection is lower.

### 2. John Slater's Back Problems

Mr. Slater's second argument for release concerns his severe back pain that limits his ability to walk. Mr. Slater's attorney represented that the BOP's medical staff "has told [Mr. Slater] that they have done all they can for his back issues and that he is best served by having the Veteran's Administration perform surgery on his back." *Def.'s Victim Reply* at 6. In a later submission, Mr. Slater's counsel stated that BOP told Mr. Slater that "unless he receives back surgery he faces the possibility of confinement to a wheelchair for the rest of his life." *Vaccination Notice* at 1.

The record does not support counsel's representations about the dire nature of Mr. Slater's back condition. The most recent medical opinion concerning the severity of Mr. Slater's back condition comes from Dr. Juneau's April 27, 2021 report. *Juneau Report.* There, after reading Mr. Slater's January 13, 2021 MRI, Dr. Juneau concluded that Mr. Slater "does have some moderate spinal canal stenosis at the L4-5 level" and "has severe right foraminal stenosis due to some bulging of the disc and thickening of the ligamentum flavum" and that "[o]n axial image #25, the right L4-5 neural foreman is occluded." *Id.* at 3. Dr. Juneau recommended that Mr. Slater's symptoms should first be treated through outpatient physical therapy and lumbar epidural steroid injections. *Id.* at 4. Mr. Slater's counsel's prior claims about the extreme severity of Mr. Slater's condition are not medically corroborated. For example, Dr. Juneau nowhere wrote that Mr. Slater needed back surgery or would be

forever confined to a wheelchair unless he had back surgery.  *Id.*  Instead, Dr. Juneau said Mr. Slater would be a candidate for surgery if the physical therapy and steroid injections did not relieve his symptoms.  *Id.*

Dr. Juneau's report confirms that Mr. Slater's condition is not as serious as his counsel suggested and may be resolved through physical therapy and steroid injections available to him while incarcerated.  The Court permitted Mr. Slater to supplement the record in response to Dr. Juneau's findings.  Mr. Slater did not do so, aside from asking the Court to view an MRI image that the Court cannot meaningfully interpret.  If Mr. Slater's back condition deteriorates further or if the need for surgery arises during the remainder of his incarceration, he may file a renewed motion for compassionate release on that basis.  On the current record, however, Mr. Slater has not shown his back condition amounts to an extraordinary and compelling reason for his release.

## C.     The Section 3553(a) Factors

Pursuant to 18 U.S.C. § 3582(c)(1)(A), the Court also considered "the factors set forth in section 3553(a) to the extent that they are applicable."  Although the Court considered each section 3553(a) factor, it concludes the need "to provide just punishment" and the need "to protect the public" are the most relevant to Mr. Slater's case.  18 U.S.C. § 3553(a)(2).  Both of these factors favor denying Mr. Slater's motion.

### 1.     John Slater Is a Danger to the Public

The Court concludes Mr. Slater's release would endanger public safety.  In reaching this conclusion, the Court gave weight to three factors.  First, Mr. Slater is

unquestionably a serious recidivist. Second, Mr. Slater's bank robbery was impetuous and without a rational basis. Third, the Court recognizes that Mr. Slater is elderly, in poor health, and could access substantial resources on release but ultimately concludes these considerations are insufficient to mitigate the danger he poses to the public.

### a. John Slater Is A Lifelong Recidivist

At sentencing, the Court identified Mr. Slater's criminal history as his "most striking feature." *Sentencing Tr.* at 32:9. Prior to his most recent federal sentence, Mr. Slater had been sentenced to sixty-three years of incarceration since age eighteen, despite only being sixty-seven years of age. *Id.* at 32:11-13. This is possible because Mr. Slater frequently received suspended sentences. *Id.* at 32:13-15.

The Court offered the following observation at Mr. Slater sentencing:

Almost all [Mr. Slater's] crimes involve theft, forgery, or embezzlement. He has an unusual tendency to steal motor vehicles. He has six convictions in which he fraudulently purchased or drove away with a motor vehicle.

Other than the gross sexual assaults and a terrorizing charge or charges, which may have in some way been related to the gross sexual assault convictions, before this bank robbery, he has not threatened or used violence in his crimes.

*Sentencing Tr.* at 33:14-22.

The Court's view of Mr. Slater's criminal history is unchanged. He is a recidivist of the worst ilk and his past has repeatedly proven prologue for future crimes. The path to his jail cell is paved with second chances, suspended sentences, parole, probation, and supervised release. Regrettably, each time a judge has shown

47

Mr. Slater leniency, he has returned to his criminal ways. In fact, on several occasions, Mr. Slater committed new criminal conduct within mere days or weeks of an arrest or sentencing for a prior offense. *See, e.g.*, *PSR* ¶¶ 30-33, 43-45.

In a case like this, the Court sees a clear need to protect the public by incapacitating Mr. Slater through incarceration. In 2001, nearly twenty years ago, Judge Singal of this District told Mr. Slater, "[a]t some point, someone either has to appreciate that there are rules of society that have to be followed, or society makes the determination that the individual simply can't operate in general society. In my view, . . . the latter is probably more appropriate in this case." *United States v. Slater*, No. 1:01-cr-00028-GZS, *Tr. of Proceedings* at 22:3-7 (ECF No. 11).

Despite Judge Singal's admonition, Mr. Slater committed an armed bank robbery and came before the Court for sentencing in 2016. Back then, the Court agreed with Judge Singal's keen assessment. As the Court stated when it sentenced Mr. Slater for robbing the Bank of Maine, "[Mr. Slater,] you have committed the worst crime of your life in your late . . . 60s, and all the other times you've gone to jail, all the other lectures you've heard from judges about not doing this again haven't been effective. . . . So I'm troubled that if I give you a minimal sentence, I'm going to find that you'd do something again that causes someone else harm, and my job, above all, is to protect the public." *Sentencing Tr.* at 42:1-11. Faced with this motion, the Court reaffirms its prior findings. Mr. Slater's extensive criminal history indicates the public is not safe when he is living in the community.

### b.    John Slater's Bank Robbery Was Impetuous and Without Rational Basis

One of the most confounding aspects of Mr. Slater's bank robbery offense is his lack of rational motive. At sentencing, Mr. Slater stated "[t]his bank is – is something that I just – I really don't understand why I did it. You know, I was riding around that day, and – and about a week before I did that bank, why I kind of looked at it, and that morning, why I took my pistol and got a coat on and a hat and walked in and – and got the money." *Sentencing Tr.* at 28:9-14. Mr. Slater's counsel observed that he was not in financial distress at the time of the bank robbery and received more than $3,000 each month from the VA and in Social Security benefits. *Id.* at 20:16-18. Mr. Slater confirmed money did not motivate him to rob the Bank of Maine, stating, "honestly, I didn't need that money. I got almost $4,000 a month when I'm out. I don't have anything when I'm in" and "[y]ou know, it was done, and it didn't have to be. You know, I wasn't – I didn't need the money, and all my expenses were paid by the fiduciary unit . . .." *Id.* at 28:14-16, 29:8-10

Without a financial motive, Mr. Slater's decision to rob the Bank of Maine lacked any rational explanation. At his sentencing, the Court remarked to Mr. Slater that "[i]t's obvious, it seems to me, that you had to know this robbery was not planned in any way that would avoid detection." *Sentencing Tr.* at 37:1-3. Mr. Slater agreed, stating "I didn't plan it." *Id.* at 37:4-5. The Court responded that was obvious, because Mr. Slater robbed a local bank, did not wear a disguise of any kind, spent a fair amount of time with the teller so that she could clearly identify him, and

49

immediately purchased a motorcycle after departing with the cash. *Id.* at 37:12-18. Moreover, Mr. Slater told the arresting officers that he robbed the Bank of Maine because it was the closest bank to his home. *PSR* ¶ 8. Placing his offense within the broader context of Mr. Slater's criminal history, the Court ventured:

> [Y]ou keep committing crimes, and you know that in committing crimes, you go back to jail; that's what happens when you commit a crime. And I'm beginning to think maybe, Mr. Slater, that – and I know this happens with some people – and it may be happening with you . . . that jail for you has become normal, and that living on the outside is not normal, and you feel odd about living on the outside, and there's a familiarity and a routine about jail that perhaps gives you some sort of sense of routine and security that causes you to commit crimes that bring you back to jail.

*Id.* at 38:3-13.

The Court's assessment of Mr. Slater is consistent with his sentencing allocution. At his sentencing, Mr. Slater engaged in the following exchange with the Court:

THE COURT:       Mr. Slater, as a defendant before the Court for determination and imposition of sentence, you have a constitutional right to address the court at this time. Do you have anything you wish to say to me?

MR. SLATER:      No, I think we've covered most of it.

                            The only thing I will say is ever since I got back from Vietnam, I don't feel like I belong anywhere. I don't like being in prison, but I don't stay out of prison very long before I do something to go back to prison. I am not comfortable in the community, and I am not comfortable in prison once I get there.

                            And I don't know – I don't know what that's about or whether it's the PTSD or what, but prison has been kind of a solace for me, and it's complicated. I don't know . . . what it is. I mean, I don't stay out very

|            | long, and when I get out, I stay out a year or so and then find my way back. |
|------------|------------------------------------------------------------------------------|
| THE COURT: | Why? |
| MR. SLATER: | I don't know.  It – I know I'm not comfortable out – out of prison, and I know I'm uncomfortable in prison.  I just – I feel like there's no place for me sometimes. |

*Sentencing Tr.* at 26:6-27:2.

Mr. Slater's own words provide the strongest evidence that his criminality is impetuous and without rational explanation.  With a lack of evidence of a clear motive, the Court is reluctant to release him because not knowing why he committed this bank robbery in the first place, it cannot conclude that he will not do so again.

### c.     Mr. Slater's Age, Health, and Access to Resources Upon Release Do Not Outweigh His Lifetime of Criminality

Despite the severity of Mr. Slater's criminal history and the senselessness of his crime, the Court acknowledges Mr. Slater may be less dangerous than he was at the time of the bank robbery.  As discussed, Mr. Slater is becoming elderly and suffers from numerous health conditions and physical impairments.  In the Court's view, however, the extent of any risk reduction is too difficult to quantify.  While Mr. Slater's poor health may somewhat reduce his capacity for criminal activity, his medical records do not show he is entirely incapacitated.  This is problematic because Mr. Slater has, at least twice, purchased guns through private sales and carried them during criminal activity.  *PSR* ¶¶ 32, 43.  Despite Mr. Slater's physical

limitations, the Court remains concerned that he could cause serious harm if he possesses a gun.

The possibility that Mr. Slater could be placed under robust conditions of supervised release does not ease the Court's concerns. The Court fears that if Mr. Slater becomes dissatisfied with his life on the outside and fixated on returning to prison, he will find a way to do so, notwithstanding his poor health or supervision by the PO. He may harm other people in the process. Thus, the Court concludes that although Mr. Slater's age and poor health favor his release, these factors are ultimately insufficient to tip the balance in Mr. Slater's favor.

The Court has also considered that Mr. Slater is a fully disabled combat veteran with access to support services upon release from incarceration that may not be available to the typical inmate. At the time of his sentencing, he received more than $3,000 each month in combined benefits from the VA and Social Security Administration. Although the Court is unsure what impact, if any, his current incarceration has had on his right to these benefits, it appears his benefits did not terminate after his prior federal conviction for being a felon in possession of a firearm. The Court suspects that Mr. Slater may be entitled to have at least some of his medical care provided by the VA. Thus, the Court finds it likely that Mr. Slater will have some means to support himself after release from incarceration.

In addition to providing him with financial resources, Mr. Slater's status as a veteran makes him eligible for certain programming that may assist him as he reenters society. In briefing on his compassionate release motion, Mr. Slater

represented that the Salvation Army and United States Department of Veterans Affairs may be able to help him transition from prison to the community. *Def.'s Mot.* at 5-6. He specifically mentioned the Health Care for Re-Entry Veterans Program. *Id.* In a filing dated January 4, 2021, Mr. Slater's counsel indicated that transitional case management through the Salvation Army may be desirable and that he had contacted the Veteran Case Manager Secretary at the Shreveport, Louisiana Salvation Army. *Mot. to Withdraw Mot. for Compassionate Release (ECF # 102)* (ECF No. 106). Mr. Slater's counsel averred that the case manager said "Mr. Slater is welcome into their facility provided he meets prerequisites of The Salvation Army contract with the VA Healthcare for Homeless Veteran's program." *Id.*

The Court finds that, in conjunction with supervised release, the Health Care for Re-Entry Veterans Program and other VA and Salvation Army Programs may provide Mr. Slater with some support to help his reentry into society. However, Mr. Slater has not satisfied the Court that his financial stability and reentry programming will be enough to protect the public from Mr. Slater. From the Court's review of the record, Mr. Slater was financially secure and had access to veterans programming at the time of his bank robbery offense and money was not his motive. Moreover, the typical non-custodial measures of controlling criminal activity, such as suspended sentences, probation, parole, and supervised release, have repeatedly proven ineffective when applied to him. Thus, much like Mr. Slater's declining health, the Court is unpersuaded that Mr. Slater's access to resources will sufficiently reduce the danger he presents to public safety.

### 2. Principles of Just Punishment Strongly Favor Mr. Slater's Continued Incarceration

The Court further concludes that principles of just punishment favor Mr. Slater's continued incarceration. In reaching this conclusion, the Court considered the dangerousness of Mr. Slater's offense and the harm he inflicted upon his victims.

As for dangerousness, Mr. Slater walked into a bank clutching a loaded concealed handgun, threatened bank staff, and handed a teller a note indicating that he had a hand grenade and would kill everyone in the bank if they tried to stop the robbery. Mr. Slater then escaped with $15,000 in cash, which he promptly frittered away on a motorcycle, furniture, food, and some cigarettes. Despite being identified as the bank robber within days of the robbery, Mr. Slater was a fugitive for approximately two weeks as he traveled from Maine to the Pro Football Hall of Fame in Canton, Ohio before hiding out at a cabin in the White Mountains with a .32 caliber revolver. In the Court's view, Mr. Slater's blatant disregard for the law and public safety necessitates that he serves his full sentence.

A related consideration is the extensive harm Mr. Slater caused to his victims. At sentencing, the Court discussed the psychological trauma to the bank teller that Mr. Slater threatened on the day of the robbery. Relying on the teller's statement, the Court noted, "[s]he had to go to the hospital. She had to receive counseling. And she's terribly worried about ever seeing [Mr. Slater] again, even though she knows he's in jail." *Sentencing Tr.* at 36:7-10. Discussing Mr. Slater's threat to the teller, the Court observed, "I have to think that his threat, which she has to have taken very

seriously, that if he were found out or if she did something wrong, he would come back and kill them all must hang on her terribly." *Id.* at 36:11-14.

Mr. Slater's victims' trauma is ongoing. Mr. Slater's victims' recent submissions confirm that even now, nearly seven years after Mr. Slater robbed the Bank of Maine, they are still trying to overcome the distress he caused. The teller whom Mr. Slater threatened reports that she has kept a file "to see when he is getting out." *Threatened Teller Statement.* She says that "it scares [her] that [Mr. Slater] will do it all over again . . .." *Id.* She also writes that "when [she is] out shopping or riding around [she] find[s] herself still looking around to see who is there and what might happen." *Id.*

Another bank teller says "I lost a sense of trust in people that I'm not sure I will ever get back." *Second Teller Statement.* That teller reminds the Court of "the note that says 'one day I will come back and kill all of you, do you understand?'" *Id.* In light of that note, the teller questions why Mr. Slater "get[s] to get released and bring fear back into the people who stole not only our sense of comfort in a job but stole our innocence of not fearing someone is looking for you." *Id.* Camden National Bank, the successor-in-interest to the Bank of Maine, raises similar concerns and asks the Court to consider "the physical threat, mental anguish, and excessive burden," of Mr. Slater's conduct on "bank employees, customers, shareholders, and the community." *Bank Statement.*

The Court concludes Mr. Slater's conduct and threats toward the Bank of Maine employees during the robbery strongly suggest his release would endanger the

public.  In his demand note, Mr. Slater threatened to return to the bank and kill everyone if the bank staff foiled his robbery attempt.  The Court takes Mr. Slater's threat seriously and concludes a specific threat to harm his victims weighs strongly against his release.

## VI.    CONCLUSION

The Court DISMISSES without prejudice John C. Slater's Amended Motion for Compassionate Release and Motion for Modification of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) (ECF No. 109).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 29th day of June, 2021.